## BARNETT et al. v. BLACKSTONE COAL & MINING CO.

No. 4123—Opinion Filed November 23, 1915.

Rehearing Denied July 11, 1916.

(158 Pac. 588.)

**1. Courts—Jurisdiction—Probate Proceedings—Appeal.**

Where an order is made by the county court, authorizing and directing the guardian of the estate of a minor to lease the lands of his ward, and a petition is thereafter filed in the same case to revoke and set aside said order authorizing said lease, and is heard by said court and denied, the proceeding to set aside said order, authorizing said lease, being a probate proceeding, an appeal therefrom lies to the district court.

**2. Same — Jurisdiction — County Courts — Vacation of Orders.**

The county courts of this state have full control and jurisdiction of all probate matters, and may at any time, prior to the majority of any minor whose estate is involved in a proceeding pending in said court, upon proper notice and for legal grounds, modify or vacate any order or judgment made by said courts regarding the estate of said minor.

**3. Appeal and Error—Bonds—Sufficiency.**

Notwithstanding section 5460, Comp. Laws 1909 (section 6510, Rev. Laws 1910), requires an appeal bond on appeal from the county court to the district court to be made payable to the state of Oklahoma, an appeal bond otherwise in exact conformity with the statute, but payable to the adverse party, is a valid bond.

**4. Weight of Evidence—Substantial Justice.**

The entire record in this case examined, and the judgment rendered found to be upheld by the weight of the evidence and to do substantial justice.

(Syllabus by Collier, C.)

Error from District Court, Muskogee County; R. C. Allen, Judge.

Petition by the Blackstone Coal & Mining Company against T. A. Barnett, guardian of Birdie Barnett, a minor, and others, for a vacation of an order of the county court. From a order of the county court denying vacation, petitioner appealed to the district court; and from a judgment there for petitioner, defendants bring error. Affirmed.

S. B. Dawes and Charles A. Cook, for plaintiffs in error.

Horace Speed, for defendant in error.

Opinion by COLLIER, C. On the 27th day of April, 1905, the then guardian of Birdie Barnett, a minor, under proper order of the United States Court of the Indian Territory, executed a lease to the Blackstone Coal & Iron Company, a corporation, for the development of coal on the lands of said minor. On the 10th day of February, 1907, the then qualified and acting guardian of said Birdie Barnett filed his petition in the county court of Muskogee county to set aside said lease to said company, and to lease said lands to Wesley and Harry Sheward, upon the ground that "said company has not to date done a reasonable amount of development work of mining." Said company voluntarily appeared in said county court, and filed its answer and protest to said petition of said guardian. On January 15, 1908, the court heard said cause, set aside said lease to said company,

and authorized and ordered said guardian to execute a coal mining lease on said lands of his ward, Birdie Barnett, to the said Shewards, which lease was executed, and on the 16th day of January, 1908, approved by the court. On January 31, 1908, the company, in the same case and under the same number, filed its petition, praying that the order of the court authorizing and directing the guardian to lease said lands to said Shewards be vacated and set aside, which was heard on January 4, 1909, and judgment rendered in favor of the guardian, refusing to set aside and vacate said order sought to be vacated. Thereafter said company appealed from the order of the county court refusing to set aside the order directing and authorizing the guardian to lease said lands to the Shewards, and perfected its appeal by filing in said county court notice of appeal and executing appeal bond, which bond was approved by said county court. Thereafter the clerk of said county court certified the records of said cause to the district court of Muskogee county. The company, by leave of court, amended its petition, to which the then guardian, T. A. Barnett, demurred, which demurrer was overruled. On the 13th day of December, 1911, said cause came on for hearing in the district court, and was tried to the court. Upon conclusion of the evidence of plaintiff, the guardian demurred thereto, which demurrer was overruled and exception saved.

The evidence in this case is very voluminous, and very many objections are interposed to various parts thereof. Upon a careful consideration of the entire evidence, we are of opinion that the findings of the court as to the facts are supported by the weight of the evidence, and such findings are therefore adopted as the material evidence in the case. The court found the facts as follows:

"The Blackstone Coal & Mining Company is, and since 1904 has been, a corporation organized for the purpose of mining coal and other minerals, under the laws of Arkansas, whose principal officers were, and yet are, Dr. John K. Blackstone and Dr. L. H. Grant, of Crown Point, Ind. That Birdie Barnett, a minor, on the Creek freedmen's rolls, was allotted the land in controversy about 1901 to wit, the east half (E. ½) of the northeast quarter (N. E. ¼), and the east half (E. ½) of the southeast quarter (S. E. ¼), less the railroad right of way, consisting of, to wit, a seven and three-fourths (7¾) acres, more or less, as shown in a lease by said Barnett, in section thirty-one (31), township twelve (12) north, of range thirteen (13) east, now in Okmulgee county, Oklahoma. That in 1903 or 1904 an imperfect lease or license to mine coal on that allotment was granted to said Blackstone Coal & Mining Company, hereinafter called the Blackstone Company, by said Garfield Barnett, as guardian of said Birdie Barnett, a minor, under which lease some

mining was done and considerable sums of money were expended by that company upon the development and improvement of the mine and the installing of machinery, and building some houses, and paying the railroad company for the construction of a railroad switch and track for the mine from its main track to the mine, and other sums so paid to the guardian under the name of advance royalties, or bonuses, or rentals. At that time the property was valued in the reports of the guardian at about $1,000, and the payments made by the company to the guardian amounted, before 1905, to about one-half of that sum. In 1905 the mining was stopped by the government officers, and it became necessary to make a more perfect lease with a bond to secure the performance of its terms, and more fully protect the estate of the said ward as to payments under the lease. In April, 1905, that lease was signed by said Garfield Barnett, as such guardian, to such Blackstone Company, but was not approved by the necessary government officers until in April, 1906, and the bond therefore was not perfected and approved until September 22, 1906, and mining could not, under the lease, be done until the bond was so approved.

"Shortly before or after the lease was signed in 1905, a fire destroyed the tipple house and other burnable improvements at the mine. After the fire the railroad company in 1905 took up the track and took out the switch, which made mining impracticable until they were replaced. The Blackstone Coal & Mining Company had paid the railroad company for putting in the switch and track. After the lease was signed the Blackstone Company persistently, by letters and personal visits, urged the railroad company to put back the switch and track; but the railroad company refused to do this until, in July, 1907, they agreed it should be done at an early day. That agreement by the railroad company was by Dr. Blackstone, for the Blackstone Company, communicated to Garfield Barnett, guardian, by letter on July 27, 1907. In the spring of 1907, and also in or about June of 1907, Mr. Griesel, who lived in Muskogee, but each time had just returned from visits to Indiana, where he had seen Dr. Blackstone, acting at Blackstone's request, called on Barnett and told him that Dr. Blackstone had told him he hoped the switch would be soon put in and mine operations resumed at the mine, at which Barnett expressed his satisfaction to Mr. Griesel, saying in substance, 'All right.' A later like conversation was had by Griesel, with said Barnett in October, 1907, with an expression of satisfaction on the part of said Barnett. The Blackstone Company had kept its annual lease money—by whatever name it was called —paid each year, and in June, 1907, paid the lease money for the year ending in April, 1908. These payments were made to the Indian agent, for the use of Barnett, as guardian, and by the agent deposited in the bank for him, and he kept track of those payments, and knew of the payment of June, 1907. In June and July, 1907, the Blackstone

Company was engaged in negotiations with the representative of the cement works at Ada, Okla., with a view to selling to the cement works 51 per cent. of the stock of the Blackstone Company, and making a contract with them for the output of the coal mine, up to 100 or 125 tons of coal per day.

"About August 5, 1907, after these negotiations had been for some time on foot, Mr. Thomas D. McKeown, as the attorney for the cement works, came to Muskogee to see about the lease title and other matters, and there met Garfield Barnett. Barnett at first demanded $500, and said if that sum was paid him he would give a coal mining lease on the land. Barnett clearly showed, and the negotiations clearly showed, that the money was not to be paid for the benefit of the trust, but was to be paid to Barnett to secure his personal consent, action, and influence in obtaining such lease. Mr. McKeown was also informed that the Blackstone lease need not be considered as of any binding force. Some days thereafter Mr. McKeown returned to Muskogee with Mr. Kice, one of the officers of the cement works, to see further about obtaining the lease. Together McKeown and Kice saw Barnett and his attorney, and Barnett then offered to have a lease made to the cement people for the consideration of $250, and again showed that this was not to be for the benefit of the trust, but to influence and to induce him personally to act favorably in the matter. Mr. Kice refused the proposition and departed, and no effort was thereafter made by the cement people to obtain a lease on that mine. On or about the day McKeown at Muskogee had the talks with Barnett—August 5, 1907—the latter wrote a letter to Dr. Blackstone, telling him that if the Blackstone Company did not proceed with their work he would, in 30 days, declare the lease forfeited. On September 5, 1907, Dr. Blackstone came to Muskogee, talked matters over with Barnett, told him the conditions, that the switch had been agreed on by the railroad company, and would soon be put in, and that the mine would be cleaned out, equipped, machinery bought and installed, and coal production pushed as fast as could be done. Barnett expressed his gratification at that, and said that if the switch was in by Christmas or the New Year, and the mining of coal then resumed, all would be satisfactory, and upon the faith of a Mason pledged his own fairness. The railroad proceeded in October to put in the switch and track, and completed the same before the 1st of November. During October or November said Barnett wrote a letter to the United States Indian agent at Muskogee, and asked that he forfeit the lease. The agent investigated the matter, wrote to and got a letter from the Blackstone Company as to what they had done and were doing and proposed in the premises, and thereupon wrote a letter to Garfield Barnett, guardian, refusing to forfeit the lease. This letter to Garfield Barnett was written after the railroad company had begun to put in its switch, and after Barnett had reasonable cause to know, if not actual knowledge, that they were putting it in.

"In October the Blackstone Company, through Dr. Blackstone, employed Sid Haynes, an expert miner and foreman, as foreman of the mine, at $125 per month, his work to begin on November 1, 1907. On that day Haynes, with two or three men, began cleaning up the mine, erecting the necessary mine houses or 'shanties,' such as the tipple house and toolhouses, and buying and installing the machinery required in the mine, and with proper diligence prosecuted the work, and on or about the 1st day of January, 1908, began mining coal, and so continued while he was in possession of the mine, which possession ended some time in February, 1908. The mining was begun by him, with several men, increasing the number until on January 15, 1908, he had eight or ten or more men mining coal, and was getting out about 60,000 pounds per day. In September or October, 1907, Barnett and Wesley Sheward began negotiations for the lease for coal mining purposes to Wesley and Harry Sheward, the defendants, upon the terms which included the payment by them to him, for his own personal benefit, of $200 for his consent to and obtaining the lease. On November 9, 1907, that sum was paid by them to him under the arrangement, and he used it as his own. For that sum he executed a receipt, which is in evidence. About that date, and after the payment had been made, Barnett and Wesley Sheward went to the mine, saw the work proceeding, some clearing out having been done, and one or two houses used about the mine constructed.

"A few days later Harry Sheward brought in a car some articles which had been used in a mine somewhere, a rope, car wheels, iron rails, and other things, second-hand material, not then usable there, and threw them off the car near the mine. About December 10, 1907, Barnett, as guardian, filed in the county court of Muskogee county a petition, asking for authority to lease the land for coal mining purposes to Wesley Sheward and Harry Sheward for a bonus of $800 and a royalty of 8 cents per ton on coal mined. The petition said nothing about the facts indicated above, as to which the court should have been fully advised, in order to rightly consider and decide the matter presented by the petition. The $200 received by him was not mentioned, and was not intended to be included in the $800 mentioned in the petition, and it was not intended that the court should know of it. Neither did the petition inform the court of the expenditures and preparations then being made by the Blackstone Company to resume the mining of coal, or its attempts to arrange so that the cement works should use so much of its output. The extent of the information and its quality, and its omission of the material facts, are obvious from reading the petition.

"No notice was sent to the Blackstone Company of the filing of this petition, but it was advertised in a newspaper and was seen by

Mr. Griesel, who notified them, but upon what day he so notified them does not appear in the evidence. On the day of the trial, Dr. Blackstone appeared in court, and for the Blackstone Company filed a protest against the execution of the lease to the Shewards, and setting up the claim of that company. On January 15, 1908, the petition was heard by the court, both sides presenting evidence Neither side advised the court as to the deal in which Barnett was to have, and had received $200 for his own use, in consideration of his services and action in obtaining the lease; nor were any of the above facts clearly shown to the court. The omission by Barnett and his evidence each misled and deceived the court. The facts as to the corrupt deal with the Shewards and the negotiations with the cement works were not made known to the Blackstone Company, or to the court, until after the trial and judgment, and were not known to the said Blackstone Company, or any of its officers, until some days after the trial; the exact date not being clearly shown by any evidence. Some of the attorneys who acted for Barnett in filing the petition and trying the case were the attorneys for the Shewards, and all the attorneys who so acted for Barnett were paid by the Shewards before the trial, or shortly thereafter, in part, if not in full.

"It does not appear that these conditions were known to the county court or reported to it at any time. The case begun on the 15th day of January was ended on that day, or within the next two days, by the order of the court, directing Blackstone [Barnett] as guardian to execute a lease to the Shewards, as prayed in his petition. On that day, January 15th, the Shewards gave Barnett a bank check for $800 for the bonus stated in the petition. The day before the trial, upon information sent from Muskogee by Wesley Sheward, Harry Sheward came to Muskogee with more than $600 in money which he drew from a bank for that purpose. On January 15th Harry Sheward loaned to Barnett—who was employed as barber in a barber shop— and to another barber, as partner of said Barnett, $600 of the money so brought by him to Muskogee, the loan to be used to enable him to buy out another barber shop, which was at once done. Barnett and his new partner, for the loan, gave their notes to Harry Sheward, without security, payable $100 each month, with interest until each was paid. Harry Sheward had no particular acquaintance with those men.

"January 17, 1908, after the order of the court was made and the lease was executed, these notes were returned by Harry Sheward to Barnett, indorsed as paid, and Barnett returned the check for $800 to the Shewards, and they gave him $200 in money, so that the trust lost $600 and had nothing to show for the loss, and the notes were not indorsed to it. Barnett was liable on his bond for this loss as for any other breach of duty, but his partner was not liable to the trust for this money, if it was by any possibility to be considered money in which the trust was interested. The conduct of Barnett in this transaction, beginning with his negotiations with the cement company, was corrupt, unfaithful to his trust as guardian, to his duty towards the estate in his charge, towards the court, whose officer he was, and towards the Blackstone Company, who was his tenant under the lease aforesaid, and was a fraud upon each of them. The conduct of the Shewards was equally fraudulent, corrupt, and reprehensible. The order of the court and the lease so obtained should not be permitted to continue in effect, but should be annulled, canceled, and set aside."

Upon said findings of fact the court entered the following judgment:

"It is therefore by the court considered, adjudged, and decreed, that the said judgments and orders of the said county court of Muskogee county, of January 15, 1908, and of the 4th day of January, 1909, be and the same are hereby reversed, set aside, and annulled, and the said lease executed by Garfield Barnett, as guardian of Birdie Barnett, a minor, to Wesley Sheward and Harry Sheward, for mining coal on her allotment aforesaid, be and the same are hereby reversed, set aside, canceled, and annulled. It is further ordered that said T. A. Barnett, as such guardian of Birdie Barnett, and such Wesley Sheward and Harry Sheward, defendants, immediately surrender to said Blackstone Coal & Mining Company the possession of said coal mine and full and complete use of said tract of land, so far as the same is given to said company under the terms of the lease so executed to it as aforesaid in April, 1905, and approved in 1906, with all the tools, machinery, and equipment in, upon, or about said mine and said allotment, belonging to said Blackstone Company, or in anywise appertaining to said mine as owned and operated by or for said company in January, 1908, or when it was taken possession of by said Shewards, or either of them; that, as a reasonable compensation for their use of said mine, said Shewards account to said Blackstone Company for all coal taken from said mine by them since January 15, 1908, at the rate of 8 cents per ton of 2,000 pounds; that against any and all claims, demands, rents, advances, royalties, or bonuses under said lease of 1905, due or owing by said company to said Barnett, as such guardian, or to said Garfield Barnett, as such guardian, there be allowed an offset of 8 cents per ton of 2,000 pounds for all coal raised or taken out of said mine by said Shewards from January 15, 1908, until the time they ceased to operate the mine, and that they pay to said Blackstone Coal & Mining Company the value of all machinery, tools, equipment, and buildings belonging to the said company, and taken by said Shewards, and not returned by them to said company, and also for all the wear and depreciation of all tools, machinery, equipment, and buildings so taken or used by them, and under this order returned to the Blackstone Coal & Mining Company, and that

they also account and pay to said Blackstone Company the fair rental value of all such tools, machinery, equipment, and buildings, during the time so used by them, to wit, from January 15, 1908, or when they took possession thereof, until they so deliver possession thereof to said Blackstone Coal & Mining Company.

"It is further ordered that said Wesley Sheward, Harry Sheward, and T. A. Barnett, as guardian, pay the costs of this action, taxed at $_____. The clerk of this court will return the papers in this case to the county court of Muskogee county, Oklahoma, for further proceedings in accordance with this judgment. All of which is finally ordered, adjudged, and decreed this December 29, 1911.

"R. C. Allen, Judge."

Thereupon defendants filed a motion for new trial, which was overruled and excepted to. To reverse said judgment this appeal is prosecuted.

It is earnestly urged by plaintiffs in error that this appeal should be dismissed, and the cause remanded, upon the grounds: (1) That the appeal bond filed in this case in the county court runs to the adverse parties, and not to the state; (2) that the county court was without jurisdiction to entertain the protest and petition of the company to vacate the order authorizing the lease to Wesley and Harry Sheward.

It is true that section 5460, Comp. Laws 1909 (section 6510, Rev. Laws 1910), requires that the appeal bond under consideration must be to the state of Oklahoma, and that said bond is made to Garfield Barnett, as guardian of Birdie Barnett, and Wesley and Harry Sheward; but it is our opinion that the substitution of the obligees named in said bond for the state of Oklahoma as obligee did not vitiate said bond, nor does it sustain the contention of plaintiffs in error that the failure to have said bond run to the state of Oklahoma is a ground for dismissal of this appeal. In Thompson v. Grider Implement Co. et al., 36 Okla. 165, 128 Pac. 266, it is said:

"It will be observed, from these sections, that the bond should run 'to the state of Oklahoma,' and that suit may be brought by any persons to whom there is due any sum for labor or material. If, therefore, this is the bond contemplated by these statutes, the plaintiff had the right to maintain the action upon it. It is insisted by the defendant that it is not a statutory bond, because the obligee is not the state of Oklahoma, as required by statute, but the trustees of the school district. It is clear that the statute required the bond, that the bond was given as contemplated by statute, and the only question is whether in such a bond the state must be named as the obligee, in order to bring it within the terms of the statute. This question is fully an-

swered by the decision of the Supreme Court of Washington in Ihrig v. Scott, 5 Wash. 584, 32 Pac. 466, where it is said: 'It will be seen that, by the objection thus made, defendants attacked said bond upon two grounds. First, that the state of Washington was not named as obligee; and, second, that it did not sufficiently appear that the bond was executed under the provisions of the act above referred to. That a mistake in the naming of the obligee is not a fatal defect, in a bond which is executed pursuant to the requirements of a statute, in the interests of the public, when, nothwithstanding such error, it clearly appears from the bond taken as a whole that it was intended to be such a one as is required by the statute, is fully established by the authorities. See State v. Wood, 51 Ark. 205, 10 S. W. 624; Bay County v. Brock, 44 Mich. 45, 6 N. W. 101. The simple fact, then, of the want of the proper obligee in this bond, is not fatal to it, if from its terms the object for which it is executed appears. Even a superficial examination will show such to be the fact. No one can read the bond, in the light of the statute above referred to, without at once coming to the conclusion that in executing it by the principal and sureties, and the acceptance thereof by the proper officers of the school district, there was an intention on the part of all to provide the security required by said statute, in the interests of such as might thereafter, by virtue thereof, become entitled to protection.' "

In Dolese Bros. Co. v. Chaney & Rickard, 44 Okla. 745, 145 Pac. 1119, it is held:

" * * * The fact that the municipality, instead of the state of Oklahoma, is named as payee in the bond thereby required, will not invalidate such bond."

See, also, Wilken et al. v. Gevers, 54 Okla. 489, 153 Pac. 1175.

The second ground for dismissal of the appeal—that the court was without jurisdiction to hear and decide the protest and petition of the company to vacate the order of the court to the guardian to execute a lease to Wesley and Harry Sheward, for the reason that same was not a probate proceeding—is without force. In support of said contention as to want of jurisdiction of said county court, plaintiffs in error cite and rely upon the case of Ozark Oil Co. v. Berryhill, 43 Okla. 523, 143 Pac. 173, which case, instead of supporting plaintiffs in error's contention, distinctly points out that the contention of plaintiffs in error is not well taken, and that said appeal from the action of the county court was, beyond all question, a proceeding in probate. In said case the petitioner had reached his majority, and his estate as a minor was not involved, while in the instant case the minor and her estate are involved. While quoting at length from the body of the opinion in Ozark Oil Co. v. Berryhill, supra, the learned attorneys for plaintiffs in error

fail to quote at all the controlling part of said opinion, which omitted part is hereinafter quoted. The difference between the case of Ozark Oil Co. v. Berryhill, supra, and the instant case, is that in the former case the estate of a minor was not involved, while in the instant case it is, and the guardian of the minor is a party thereto. Consequently, as the subject-matter of this litigation involves the estate of a minor, the proceeding in the probate court appealed from was certainly a probate proceeding and within the jurisdiction of the county court, as clearly held in the case of Ozark Oil Co. v. Berryhill, supra, in which it is said:

"The question presented for our determition is: Was the proceeding had in the county court one in probate under the jurisdiction of the probate court? If it was, then this court would have no jurisdiction to review the judgment of the county court in said matter. Under the provisions of the Constitution, an appeal to review judgments and orders in probate matters could only be prosecuted to the district court. On the other hand, if this was not a probate proceeding, but was an ordinary action, instituted for the purpose of canceling the lease in question, then the county court was without jurisdiction, and although the judgment or order may be void, yet an appeal will lie to this court for the purpose of causing said judgment to be vacated. It is unquestionably the law that the county courts of this state have full control and jurisdiction of all probate matters, and may at any time prior to the majority of any minor, whose estate is involved in any proceeding pending in said court, upon proper notice and for legal grounds, modify or vacate any order or judgment made by said court in the interest of said minor. It will be noted that the petition filed in the county court in this matter was filed by William Berryhill after he became of age. His guardian was not a party to said proceeding."

What has been said, we think, correctly disposes of the motion to dismiss, and in doing so it follows that the jurisdiction of the district court, on appeal from the county court, and from which this appeal comes, had jurisdiction.

It therefore only remains to review the proceedings in the district court. This we have done by a careful examination of the record and evidence; and while there may have been slight errors in the admission of evidence, and even in other respects, yet, in our judgment, these errors are not sufficiently serious to require a reversal, or even specific mention in detail; for the findings of the court, set out above, are fully sustained by competent evidence, and thus present a situation of fraud and wrong, which the court did right in correcting, and the decree, being so just and so warranted, it would require to set it aside an error quite surely injurious to appellants, and quite certainly showing that they had been deprived of some constitutional or statutory right.

The case should be affirmed.

By the Court: It is so ordered.